***********
Upon review of the competent evidence of record, with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds good grounds to receive further evidence, but not to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 *********** PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' APPEAL *Page 2 
In Plaintiff-Appellant-Respondent's Reply Brief to the Full Commission, Plaintiff argued that Defendants' appeal should be dismissed for failure to comply with N.C. Gen. Stat. § 97-85, which requires notice of appeal to the Full Commission to be filed within 15 days from the date notice is given of the Opinion and Award of the Deputy Commissioner. The Full Commission will consider the aforementioned section of Plaintiff-Appellant-Respondent's Reply Brief to the Full Commission to be a Motion to Dismiss Defendants' Appeal. Defendants did not submit a written response to Plaintiff's Motion; however, the parties addressed this issue at the hearing before the Full Commission. After consideration of the written and oral arguments of the parties, Plaintiff's Motion to Dismiss Defendants' Appeal is hereby DENIED.
 DEFENDANTS' MOTION TO RE-OPEN THE RECORD TO RECEIVE ADDITIONAL EVIDENCE
Defendants moved, pursuant to Rule 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission and N.C. Gen. Stat. § 97-85, for an Order allowing the re-opening of the record in this matter to include additional evidence in the form of an additional medical record received following the closing of the record. Plaintiff did not submit a written response to Defendants' Motion. After consideration of the written arguments of Defendants, Defendants' Motion to Re-Open the Record to Receive Additional Evidence is hereby GRANTED. Accordingly, the medical record attached as Appendix A to Defendants' Motion shall be attached to the end of the stipulated exhibits.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as: *Page 3 
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction over the parties and of the subject matter of these proceedings.
2. The parties are correctly designated, and there is no question as to the mis-joinder or the non-joinder of any party.
3. The parties were subject to the provisions of the North Carolina Workers' Compensation Act at the time of the work injury.
4. Defendant-Employer is O E Enterprises, Inc., and Defendant-Carrier is Travelers Indemnity Company of America, who provided workers' compensation insurance coverage to Defendant-Employer at all times relevant to these proceedings.
5. An employment relationship existed between the parties at the time of the work injury.
6. On March 24, 2008, Plaintiff sustained a compensable work injury.
7. Plaintiff's average weekly wage is $343.14, yielding a compensation rate of $228.77.
8. The nature of the compensable work injury is that Plaintiff slipped while getting into her vehicle, and felt a sharp pain in her lower back.
9. Plaintiff alleges that her pain went from her right leg/side to her lower back, and up her neck. Defendants deny that Plaintiff sustained a compensable work injury to her neck, and never authorized medical treatment for the neck.
10. Defendant-Employer paid Plaintiff for the entire day on which the compensable work injury occurred. *Page 4 
11. Plaintiff last worked on March 24, 2008.
12. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Various documents, including:
 i. Pre-Trial Agreement;
 ii. Plaintiff's medical records;
 iii. Discovery responses;
 iv. North Carolina Industrial Commission forms and filings;
 b. Defendants' Exhibit One: Correspondence from Plaintiff to Defendant-Employer dated April 8, 2008.
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff sustained compensable work injuries to her neck, right shoulder, and right leg as a result of her March 24, 2008 work injury?
2. Whether Plaintiff is entitled to any further workers' compensation benefits?
3. Whether Plaintiff's temporary total disability compensation should be suspended or terminated based upon her alleged unjustified refusal of suitable employment?
4. Whether Plaintiff remains disabled?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following: *Page 5 
 FINDINGS OF FACT
1. Plaintiff is 61 years old, with a date of birth of November 26, 1948. Plaintiff has a high school diploma, a veterinary technician certificate, an associate's degree, and a bachelor's degree. In 1977, Plaintiff sustained significant injuries and suffered disability as a result of being in a motor vehicle accident. Following the 1977 motor vehicle accident, Plaintiff applied for and began receiving Social Security disability benefits. Following the 1977 motor vehicle accident, Plaintiff held two primarily sedentary jobs. In 1996, Plaintiff obtained a primarily sedentary position with a graphic design employer, which laid her off in 1997, and thereafter, she worked as a pharmacy technician.
2. Plaintiff's medical records document a long history of chronic back, neck, upper extremity, and lower extremity pain. In January 1997, Plaintiff underwent nerve testing, which revealed lower and upper extremity radiculopathy. In March 1997, Plaintiff's diagnoses included chronic pain and possible fibromyalgia.
3. On September 20, 2000, Plaintiff presented to Dr. William Golden McCarthy, Jr., an orthopaedist, following a work injury in which she was lifting a box and felt sudden pain in her right shoulder and upper back. Plaintiff complained of back, leg, arm, and hand pain that she rated as 10 on a pain scale of one through 10 with no improvement with physical therapy. Plaintiff denied any prior history of back pain or injury, and stated that she was unable to work. Plaintiff also reported sustaining a work injury to her right index finger when she stuck herself with a sterile needle, and she had swelling and limited motion in her hand. Dr. McCarthy diagnosed Plaintiff with a thoracic strain, prescribed prescription medication and physical therapy, and assigned her work restrictions. *Page 6 
4. On November 28, 2001, Plaintiff presented to Dr. McCarthy with complaints of worsening back pain over the past year and pain radiating down the right leg to the knee. Dr. McCarthy diagnosed Plaintiff with lumbar spondylosis with right sciatica, and ordered lumbar epidural steroid injections. On July 8, 2002, Plaintiff returned to Dr. McCarthy with complaints of lower back pain radiating to the right side and right thumb pain. Dr. McCarthy diagnosed Plaintiff with lumbar spondylosis with right sciatica and right trigger thumb.
5. On June 9, 2003, Plaintiff presented to her primary care physician with complaints of back pain spreading from the right side to the left side. Plaintiff also reported a history of post-traumatic stress disorder and neck tenderness. Plaintiff's diagnoses included acute myositis and lumbo-sacral pain.
6. On August 11, 2003, Plaintiff presented to Dr. McCarthy with complaints of head, neck, arm, hand, back, hip, and leg pain, difficulty using both of her arms and right hand, and migraines. Dr. McCarthy diagnosed Plaintiff with chronic thoracic and lumbar pain and chronic right tenosynovitis of the thumb, and referred her to pain management. Plaintiff reported that she was applying for disability and once she obtained it, she would seek the pain management recommended by Dr. McCarthy.
7. On March 24, 2004, Plaintiff presented to Dr. William Louis Lehman, Jr., an orthopaedist, for an independent medical examination in connection with her August 10, 2000 work injury. Plaintiff reported continued pain with vigorous grip or writing, holding onto a computer mouse, water hose, etc., and felt that she inadvertently dropped things because of pain and possibly weakness. Plaintiff also reported occasional twitching and tenderness about the radial aspect of the right thumb, especially at night, and continued chronic problems with thoracic as well as lumbar pain with chronic right sciatica. Dr. Lehman's diagnoses of Plaintiff *Page 7 
included status-post injection injury of the right hand and history of thoracic and lumbar back strain with chronic right sciatica and possible underlying diffuse cervical and lumbar radiculopathy. Dr. Lehman opined that Plaintiff was at maximum medical improvement and assigned a five percent permanent partial disability rating to her right upper extremity.
8. On October 29, 2004, Plaintiff returned to Dr. McCarthy, at which time she complained of pain in her neck, arms, right hand and fingers, upper and lower back, each side of her legs, and right hip, ankle, and foot that she rated as 10 on a pain scale of one through 10. Plaintiff described her back pain as continual with some radicular symptoms, and also bilateral numbness and tingling, right greater than left. Dr. McCarthy diagnosed Plaintiff with mild carpal tunnel syndrome and chronic back pain. Plaintiff was still awaiting her disability application approval before undergoing the pain management referral.
9. Sometime in 2005, Plaintiff relocated to Maine, and by June 2006, Plaintiff returned to North Carolina. Over the next year, Plaintiff sought treatment and medication management for her chronic pain and other conditions from primary care physicians. Plaintiff continued to receive prescriptions for several pain and other medications, including Vicodin, Fioricet, and Xanax.
10. On July 17, 2007, Plaintiff began flexible, part-time employment with Defendant-Employer as an occupational training specialist (OTS). Defendant-Employer is a community-based rehabilitation program that works with consumers who have employment barriers such as developmental and physical disabilities, mental illnesses, and/or criminal records. Defendant-Employer's mission is to serve consumers with employment barriers by providing personal and professional growth to them through providing opportunities to work. A large part of what Defendant-Employer does on a daily basis includes making various types of accommodations for *Page 8 
their consumers so that they can obtain suitable employment and remain employed. Defendant-Employer obtains referrals through such entities as vocational rehabilitation, mental health centers, and high schools.
11. As an OTS for Defendant-Employer, Plaintiff, in this particular instance, transported a consumer to a job site, would observe the consumer perform their duties, and provide assistance and/or verbal prompts if needed. Other employees assigned to OTS positions worked with clients solely within Defendant-Employer's main location, i.e., they did not travel to job sites. On January 21, 2008, Plaintiff also assumed the responsibilities of an administrative assistant. In this position, Plaintiff performed data entry work in Defendant-Employer's main facility.
12. On February 25, 2008, Plaintiff began seeing Dr. James Bernard Barber as her primary care physician in connection with her history of degenerative disc disease, cardiac arrhythmias, and hypertension. Plaintiff provided Dr. Barber with a history of her 1977 motor vehicle accident and explained that she received disability for injuries sustained as a result thereof. Plaintiff also provided Dr. Barber with a history of lower back pain which increased after she turned 40 and continues, with a pain intensity of eight on a pain scale of one through 10. In addition, Plaintiff complained of daily right hip pain and post-traumatic stress disorder. Dr. Barber's physical examination of Plaintiff revealed tenderness to palpation of the thoracic and lumbar spine. Dr. Barber diagnosed Plaintiff with lower back pain, coronary artery disease, hypertension, and cardiac arrhythmias, recommended referral to a cardiologist, and prescribed Xanax, Oxycontin, Percocet, Augmentin, Lomotil, and Phenergan.
13. On March 24, 2008, Plaintiff was working for Defendant-Employer as an occupational training specialist when she slipped while getting into her vehicle and felt a sharp *Page 9 
pain in her lower back. Plaintiff immediately called her supervisor, Ms. Ashley Fiona Drury, and reported this work injury. Later the same day, Plaintiff presented to Philip Adams Price, a physician's assistant with Orange Family Medical Group, P.A. in Hillsborough, North Carolina. Plaintiff reported immediate pain in her lower back and down through her right leg, as well as neck pain following the work injury. Mr. Price diagnosed Plaintiff with an acute lumbo-sacral sprain, and noted that he did not think that Plaintiff sustained a bony/spinal injury, but rather, most likely sustained a para-vertebral strain and direct contusion to her right hip area. Mr. Price prescribed Plaintiff with Vicodin, instructed her to apply ice to the affected areas for 30 minute intervals, to rest and elevate the affected areas, and provided a work note.
14. On April 1, 2008, Plaintiff presented to Dr. Nancy Brous, a family medicine specialist, at which time she complained of back, hip, thigh, and leg pain. Lumbar spine x-rays revealed no evidence of fracture or pathology. Dr. Brous administered an injection of Toradol for pain, prescribed Skelaxin, Nabumetone, and Vicodin, and released Plaintiff to return to work with restrictions of no lifting, pushing, bending, kneeling, climbing, or overhead work, with instructions to alternate standing and sitting, and to walk no more than one hour at a time.
15. On April 7, 2008, Plaintiff returned to Dr. Brous, at which time she provided a history of the 1977 motor vehicle accident, along with her chronic lower and upper back pain. Plaintiff also reported neck and upper back pain, which she indicated had been occurring as of her April 1, 2008 office visit, and that she thought that her "old injury started up all over again" following the March 24, 2008 work injury. Cervical and thoracic x-rays were negative for fracture. Dr. Brous diagnosed Plaintiff with cervicalgia as well as thoracic and lumbo-sacral sprains, prescribed Skelaxin and Nabumetone, and continued her previous work restrictions, with the additional restriction of no driving and to walk no more than 30 minutes at a time. *Page 10 
16. On April 9, 2008, Defendants completed a Form 60 admitting the compensability of Plaintiff's March 24, 2008 work injury to her lower back. Thereafter, Plaintiff began receiving temporary total disability and medical compensation. Defendants based Plaintiff's temporary total disability compensation upon an average weekly wage of $452.00, with a corresponding compensation rate of $301.34.
17. Prior to April 14, 2008, Ms. Donna Musson, Defendant-Employer's director of quality services and director of the facility in which Plaintiff worked, left several voice mail messages for her regarding the availability of a modified duty position. On or about April 14, 2008, Ms. Musson spoke with Plaintiff, who claimed not to have received the voice mail messages regarding the availability of a modified duty position. On April 16, 2008, Ms. Musson sent correspondence to Plaintiff notifying her that a modified duty position within her work restrictions was available, and requesting that Plaintiff report to work on April 18, 2008. In addition, Defendants also advised Plaintiff that they would provide her with transportation to and from work. However, Plaintiff did not return to work.
18. On April 22, 2008, Plaintiff returned to Dr. Barber. Plaintiff reported that she re-injured her back in connection with her March 24, 2008 work injury and was experiencing increased upper and lower back pain. Dr. Barber noted that Plaintiff was already being prescribed Vicodin, which he felt that she could use for the increased pain.
19. On April 29, 2008, Plaintiff presented to Dr. Cara Beth Siegel, an orthopaedist, in connection with her March 24, 2008 work injury. Plaintiff reported that while getting into the car that she uses for work, she slipped on a running board, grabbed the steering wheel, and developed middle and lower back pain. Plaintiff further reported that she now had constant middle and lower back pain with occasional stabbing pain into her right leg and some numbness *Page 11 
in her toes. Although Plaintiff also had neck complaints at this visit, Dr. Siegel did not note this in her workers' compensation paperwork. Dr. Siegel offered to treat Plaintiff's neck complaints through her health insurance, but Plaintiff declined. Thoracic and lumbar x-rays revealed only age-related changes. Dr. Siegel diagnosed Plaintiff with acute-on-chronic pain in the form of thoracic and lumbar sprain, and recommended that Plaintiff stop taking the Hydrocodone and try Naprosyn, undergo physical therapy, and remain out of work for three weeks.
20. On May 21, 2008, Plaintiff returned to Dr. Siegel. Dr. Siegel noted that after three sessions of physical therapy, the physical therapist was not finding that Plaintiff was making any gains or tolerating the therapy, and so Dr. Siegel discontinued it. Dr. Siegel ordered thoracic and lumbar MRIs, recommended a pain management consultation, released Plaintiff to return to sedentary employment, and restricted her driving for one month, as she reported that it was difficult for her to drive.
21. On June 2, 2008, Ms. Musson sent correspondence to Plaintiff notifying her that Defendant-Employer would be able to accommodate her sedentary work restrictions with a position immediately, and that she would be provided transportation to and from work. Ms. Musson mailed this correspondence to the same address as her previous correspondence to Plaintiff, which she signed for and accepted, and it is the same address which Plaintiff continued to have at the time of the hearing before the Deputy Commissioner. However, Plaintiff did not claim this correspondence, causing it to be returned to Defendants. Defendants then sent a copy of Ms. Musson's June 2, 2008 correspondence to Plaintiff's former counsel, asking that it be forwarded to Plaintiff.
22. On June 4, 2008, Plaintiff underwent a lumbar MRI, but was too anxious to undergo the thoracic MRI. On June 24, 2008, Plaintiff returned to Dr. Siegel, who reviewed the *Page 12 
lumbar MRI and interpreted it as essentially normal. Dr. Siegel again recommended a pain management consultation and opined that Plaintiff was capable of sedentary employment with a change of position every 30 minutes from sitting to standing and walking.
23. In June 2008, Ms. Musson completed a job demands analysis to reflect the demands of the modified-duty OTS position made available to Plaintiff. Such job demands analyses and similar evaluations are part of the core functions routinely done by Defendant-Employer in order to help people with disabilities remain employed. In developing the job demands analysis and offering Plaintiff the modified-duty OTS position, it was the intent of Defendants that Plaintiff "would continue in exactly the same position, same salary with accommodations . . . the position was unchanged. It would just be a position that would be accommodated to meet her current restrictions." The modified-duty OTS position encompassed duties that other occupational training specialists were currently performing in the course of their regular employment duties due to the particular needs of the types of consumers Defendant-Employer assigned to them at that particular time, and not due to any need to provide accommodations to these other employees. The particular duties of Defendant-Employer's occupational training specialists were highly variable at any given time, depending upon the needs of the particular consumers being served at that particular time.
24. Defendants submitted the job demands analysis to Plaintiff's counsel for review. When Defendants received no response after seven days, they submitted the job demands analysis to Dr. Siegel for review. On July 10, 2008, Dr. Siegel sent correspondence confirming that the job description submitted to her qualified as a sedentary position. On July 23, 2008, Defendant-Employer sent Plaintiff correspondence informing her that Dr. Siegel approved the *Page 13 
modified-duty OTS position submitted and requesting that she return to work on July 28, 2008. Plaintiff never returned to work after March 24, 2008.
25. On September 8, 2008, Defendants filed a Form 24 seeking to suspend Plaintiff's workers' compensation benefits based upon her unjustified refusal of suitable employment. On October 23, 2008, former Special Deputy Commissioner Christopher B. Rawls issued an Administrative Decision and Order allowing Defendants to suspend Plaintiff's workers' compensation benefits beginning September 8, 2008 and continuing until Plaintiff's unjustified refusal of suitable employment ceased. Plaintiff continued to receive temporary total disability compensation through at least October 23, 2008.
26. On February 2, 2009, Plaintiff presented to Dr. Hsiupei Chen, a pain management specialist. Plaintiff described her March 24, 2008 work injury and reported middle and lower back pain thereafter, which she rated as eight on a scale of one through 10. Dr. Chen diagnosed Plaintiff with overall severe de-conditioning, as well as cervical, thoracic, and lumbar pain, and noted inconsistencies with her physical examination with respect to results of isolated muscle testing versus her ability to step on her toes. Dr. Chen noted that Plaintiff previously had lumbar epidural steroid injections while under the care of a pain management specialist when she lived in Maine. Dr. Chen prescribed Lyrica and recommended a lumbar epidural steroid injection along with physical therapy.
27. On February 11, 2009, Plaintiff saw Dr. Barber, at which time he also recommended an epidural steroid injection; however, Plaintiff stated that she could not afford it. Prior to this date, Plaintiff had been continuing to see Dr. Barber on a regular basis for her general health and medication management, and Dr. Barber continued to prescribe narcotic pain medication for Plaintiff's chronic pain. On March 13, 2009, Plaintiff returned to Dr. Barber with *Page 14 
28. complaints of chronic pain, including upper and lower back pain. Dr. Barber switched Plaintiff from Vicodin to Percocet, and recommended a walker because Plaintiff, who sometimes used a cane, was getting weaker with her legs and needed something more for balance.
29. On April 13, 2009, Plaintiff returned to Dr. Barber with continued complaints of chronic pain in the upper and lower back, and a new complaint of right shoulder pain. Dr. Barber did not document any inciting event, and was of the opinion that Plaintiff simply reported right shoulder pain on that date unrelated to any specific event, and unrelated to her chronic back pain. Dr. Barber continued to treat Plaintiff's chronic pain with narcotic medication at this visit, and over the next several months.
30. On September 3, 2009, Plaintiff returned to Dr. Chen, with complaints of cervical, thoracic, and lumbar pain, as well as bilateral leg pain. Plaintiff also reported that since the March 24, 2008 work injury, she had a totally new area of pain in her right arm. Dr. Chen noted that Plaintiff indicated too many areas of pain on her pain diagram, and that she needed to focus on which area of pain was the greatest. Dr. Chen diagnosed numerous areas of body pain, including neck, right shoulder, bilateral leg, right foot, cervical, thoracic, and lumbar pain, and severe overall de-conditioning. Dr. Chen recommended a series of three lumbar epidural steroid injections, and then either return-to-work testing or a functional capacity evaluation.
31. On October 1, 2009, Plaintiff returned to Dr. Chen. Dr. Chen noted that the last time she saw Plaintiff, she recommended "lumbar epidural steroid injections so that she [Plaintiff] could be at maximum medical improvement, get a functional capacity evaluation done, and see what her capacity would be." However, Defendants did not authorize the lumbar epidural steroid injections. Dr. Chen further noted that Plaintiff "basically has been told in the past that she was ready for sedentary work, and she did not return to sedentary work when Dr. *Page 15 
Siegel had recommended it," and that she recommended that Plaintiff undergo a functional capacity evaluation to "get a grasp for what her physical capabilities are, give her some work restrictions, and proceed with getting her back as a functional member of society." Finally, Dr. Chen declined the request that she take over writing Plaintiff's narcotic pain medication prescriptions because she thought that Plaintiff "was on an exorbitant amount of medications that was [sic] not helping her become more productive, return to work, or improve her quality of life." In an October 6, 2009 addendum to the note for this visit, Dr. Chen again recommended that Plaintiff undergo a functional capacity evaluation, "and if there are valid test results with that, then I can write for work restrictions."
31. On October 15, 2009, Plaintiff underwent a functional capacity evaluation. Due to evidence of significant inconsistencies with respect to the effort put forth by Plaintiff, the evaluator was unable to determine a safe physical demand capacity. As of the date of the hearing before the Full Commission, Plaintiff still does not have permanent work restrictions assigned by a treating physician, and Plaintiff remains unemployed and is not seeking suitable employment.
32. At his deposition, Dr. Barber stated that Plaintiff can only drive for about five minutes before she has back pain, has a lifting limit of about five pounds, has a sitting, standing, and/or walking tolerance of about five minutes, and requires frequent changes of position. Dr. Barber opined that although Plaintiff's back pain worsened for a limited period of time following the March 24, 2008 work injury, it stabilized by her visit with him on September 12, 2008, albeit with increases in her pain medications. Moreover, Dr. Barber was of the opinion that Plaintiff's back pain was at a tolerable level after September 12, 2008, and that most of what he saw during his examinations of Plaintiff was chronic pain versus pain resulting from an acute aggravation. *Page 16 
33. At her deposition, Dr. Siegel opined that as of June 24, 2008, Plaintiff was not at maximum medical improvement, and she recommended a lumbar epidural steroid injection. Dr. Siegel further opined that Plaintiff's March 24, 2008 work injury either aggravated or exacerbated her underlying chronic pain. In addition, Dr. Siegel was of the opinion that Plaintiff was capable of performing the modified-duty occupational training specialist position as of May 21, 2008 when she released Plaintiff to return to sedentary work.
34. At her deposition, Dr. Chen stated that the findings from her physical examinations of Plaintiff led her to believe that Plaintiff might have been feigning her symptoms, and that she might have secondary gain, which made her suspicious that the March 24, 2008 work injury was not as debilitating or aggravating to Plaintiff's pre-existing back condition as she was leading Dr. Chen to believe. Dr. Chen could not delineate whether the treatment she recommended in February 2009 was for Plaintiff's chronic pain versus something new and different that occurred as a result of her March 24, 2008 work injury. However, Dr. Chen was of the opinion that the lower back pain for which she recommended a lumbar epidural steroid injection was likely secondary to degenerative disc disease. Finally, Dr. Chen agreed with Dr. Siegel's opinion that Plaintiff is capable of performing sedentary work, and that Plaintiff is not at maximum medical improvement.
35. The Full Commission gives greater weight to the opinion testimony of Dr. Siegel and Dr. Barber on the issue of whether Plaintiff's March 24, 2008 work injury materially aggravated her pre-existing middle and lower back conditions, and/or caused her neck and right upper extremity complaints.
36. The Full Commission gives greater weight to the opinion testimony of Dr. Siegel and Dr. Chen on the issue of whether Plaintiff is capable of performing sedentary work. *Page 17 
37. Plaintiff testified that she did not return to work because of pain, problems with prescription medication, and confusion regarding what duties she would be performing in the modified-duty OTS position. However, Ms. Drury stated that when Plaintiff first came to work for Defendant-Employer, she received training on the work duties encompassed in the modified-duty OTS position. Further, the greater weight of the evidence indicates, and the Full Commission finds as fact, that Plaintiff was aware of the correspondence sent by Ms. Musson setting forth the duties of the modified-duty OTS position. Thus, the Full Commission gives little weight to the testimony of Plaintiff concerning her ability to work following her March 24, 2008 work injury.
38. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's March 24, 2008 work injury materially aggravated her pre-existing middle and lower back conditions.
39. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff failed to prove that her March 24, 2008 work injury caused or contributed to her neck and right upper extremity complaints.
40. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff is not at maximum medical improvement with respect to her compensable back condition.
41. The medical treatment Plaintiff received was reasonably required to effect a cure, to give relief, and/or to lessen her period of disability with respect to her March 24, 2008 work injury. The Full Commission further finds that any future treatment recommended by Dr. Chen and/or Dr. Siegel, including epidural steroid injections and a functional capacity evaluation, is reasonably necessary. *Page 18 
42. The Full Commission finds, based upon the greater weight of the evidence, that the modified-duty occupational training specialist position is a real position that Plaintiff was capable of performing as of at least May 21, 2008. Although Defendant-Employer somewhat modified the OTS position in order to accommodate Plaintiff's sedentary work restrictions, she was essentially being offered her original position, the duties of which are highly variable, depending upon the type of consumer(s) to which the occupational training specialist is assigned. Occupational training specialists provide direct service to consumers in community settings such as the horse farm where Plaintiff worked prior to her injury, as well as in Defendant-Employer's facilities where OTS work functions are performed in group settings and include coaching and supervising the work of up to 10 consumers.
43. As Ms. Musson testified, "many OTS positions are real flexible," depending upon the needs of the current consumer base, and there are several occupational training specialists who perform the same duties as those encompassed in the modified-duty OTS position not because they need an accommodation, but because they are currently assigned to assist consumers in one of Defendant-Employer's facilities in a group setting performing work that is sedentary in nature. The specific duties encompassed in the modified-duty OTS position offered to Plaintiff would have her working as an OTS in Defendant-Employer's facility to insure the quality of work performed by consumers doing collating, mass mailings, and packaging folders. Plaintiff would be seated at a table where some of the consumers would also be sitting and performing production work. Plaintiff would be providing verbal guidance and assistance with the performance of the consumers' duties such as collating, putting labels on envelopes or postcards, sealing envelopes, and stuffing folders with brochures and letters. In addition, Plaintiff would be allowed to change positions from sitting to standing or walking as frequently *Page 19 
as her condition required her to do. Thus, the Full Commission finds, based upon the greater weight of the evidence, that such duties fall within the parameters of the sedentary work restrictions issued by Dr. Siegel.
44. The Full Commission finds, based upon the greater weight of the evidence, that the modified-duty OTS position made available to Plaintiff constituted suitable employment. The Full Commission further finds that Plaintiff unjustifiably refused the modified-duty OTS position made available to her.
45. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff failed to prove that she remains disabled as a result of her March 24, 2008 work injury. Specifically, Plaintiff failed to prove any of the following: that she is medically disabled from any employment; that she made any effort to search for suitable employment; that it would be futile for her to search for suitable employment; or that she obtained employment at a wage less than her pre-injury wage.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On March 24, 2008, Plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with Defendant-Employer to her back. N.C. Gen. Stat. § 97-2(6) (2009).
2. Plaintiff's March 24, 2008 work injury materially aggravated her pre-existing back condition, and Plaintiff's disability arising from this condition continues to be compensable. Cannon v.Goodyear Tire and Rubber Co.,171 N.C. App 254, 614 S.E.2d 440 (2005). *Page 20 
3. Plaintiff's neck and right upper extremity complaints are not causally related to the March 24, 2008 injury by accident.Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003).
4. Plaintiff is not at maximum medical improvement with respect to her compensable back condition.
5. The medical treatment Plaintiff received with respect to her March 24, 2008 work injury was reasonably necessary in order to effect a cure, to give relief, and/or to lessen her period of disability, and Defendants are obligated to pay for such treatment. Any future treatment, etc recommended by Dr. Hsiupei Chen and Dr. Cara Beth Siegel, including epidural steroid injections and a functional capacity evaluation, is also reasonably necessary. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1 (2009).
6. The burden is on Defendants to show that Plaintiff refused suitable employment. Gordon v. City of Durham,153 N.C. App. 782, 787, 571 S.E.2d 48, 51 (2002). Once an employer makes this showing, the burden shifts to the employee to show that the refusal is justified. Moore v. Concrete Supply Co.,149 N.C. App. 381, 389-390, 561 S.E.2d 315, 320 (2002). The tendered employment must accurately reflect the employee's ability to compete with others in the job market in order for the employment to be indicative of an employee's earning capacity. Peoples v. ConeMills, Corp., 316 N.C. 426, 342 S.E.2d 798 (1986). Thus, "if other employers would not hire the employee with the employee's limitations at a comparable wage level . . . [or] if the proffered employment is so modified because of the employee's limitations that it is not ordinarily available in the competitive job market[,]" the job is "make work" and is not competitive.Id. *Page 21 
7. In the case at bar, Defendants met their burden of proving that the modified-duty OTS position is a real position that Plaintiff was capable of performing as of at least May 21, 2008. Although Defendant-Employer modified the OTS position in order to accommodate Plaintiff's sedentary work restrictions, she was essentially being offered her original position, the duties of which are highly variable, depending upon the type of consumer(s) to which the OTS is assigned. Defendant-Employer has several occupational training specialists who perform the same duties as those encompassed in the modified-duty OTS position not because they need an accommodation, but because they are currently assigned to assist consumers in one of Defendant-Employer's facilities in a group setting performing work that is sedentary in nature. Peoples,316 N.C. 426, 342 S.E.2d 798 (1986); Gordon,153 N.C. App. 782, 787, 571 S.E.2d 48, 51 (2002).
8. Defendants also met their burden of proving that the modified-duty OTS position constituted suitable employment. While there are several factors that are relevant in determining whether a particular position is suitable for a particular individual, Plaintiff was essentially being offered her original position at the same rate of pay, which renders comparative wage and employment market analyses essentially inapplicable to the facts of this case.Peoples, 316 N.C. 426, 342 S.E.2d 798 (1986); Dixon v. Cityof Durham, 128 N.C. App. 501, 504, 495 S.E.2d 380, 383, disc.review denied, 348 N.C. 496, 510 S.E.2d 381 (1998);McClean v. Eaton Corp.,125 N.C. App. 391, 481 S.E.2d 289 (1997).
9. Another factor relevant in determining whether a particular position is suitable for a particular individual is the extent to which the proffered position falls within the individual's physical work restrictions and capacity. The specific duties encompassed in the modified-duty OTS position offered to Plaintiff would have her working as an OTS in Defendant-Employer's *Page 22 
facility to insure the quality of work performed by consumers doing collating, mass mailings, and packaging folders. Plaintiff would be seated at a table where some of the consumers would also be sitting, performing production work. Plaintiff would be providing verbal guidance and assistance with the performance of the consumers' duties. In addition, Plaintiff would be allowed to change positions from sitting to standing or walking as frequently as her condition required her to do. Thus, such duties fall within the parameters of the sedentary work restrictions issued by Dr. Siegel, and are within Plaintiff's physical capabilities. Peoples,316 N.C. 426, 342 S.E.2d 798 (1986).
11. Because the modified-duty OTS position is a real position that Plaintiff was capable of performing as of at least May 21, 2008 and fell within the parameters of the sedentary work restrictions issued by Dr. Siegel, Plaintiff unjustifiably refused suitable employment. N.C. Gen Stat. § 97-32 (2009).
12. Plaintiff failed to prove that she remains disabled as a result of her March 24, 2008 work injury. Specifically, Plaintiff failed to prove any of the following: that she is medically disabled from any employment; that she made any effort to search for suitable employment; that it would be futile for her to search for suitable employment; or that she obtained employment at a wage less than her pre-injury wage. Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following: *Page 23 
 AWARD
1. Defendants are entitled to suspend Plaintiff's temporary total disability compensation, based upon her unjustified refusal of suitable employment, and Defendants are further entitled to a credit for overpayment of any temporary total disability compensation paid from September 8, 2008 forward.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's March 24, 2008 work injury, including any future treatment recommended by Dr. Hsiupei Chen and Dr. Cara Beth Siegel, including epidural steroid injections and a functional capacity evaluation, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. Defendants shall pay the costs of these proceedings.
This the 18th day of October 2010.
 S/___________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT *Page 24 
COMMISSIONER *Page 1